UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

THE CHAMBERLAIN GROUP, INC.,

                    Plaintiff,

          v.

SHARY NASSIMI,

                    Defendant.

CASE NO. C09-5438BHS

ORDER GRANTING
PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY
JUDGMENT ON THE ISSUE
OF BREACH OF CONTRACT
LIABILITY

This matter comes before the Court on Plaintiff's motion for partial summary judgment on liability for breach of contract (Dkt. 82). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motions for the reasons discussed herein.

**I. PROCEDURAL HISTORY**

On August 20, 2010, Plaintiff filed the instant motion for partial summary judgment as to liability for its breach of contract claim against Defendant. Dkt 82. On September 13, 2010, Defendant responded in opposition to the instant motion. Dkt. 107. On September 17, 2010, Plaintiff replied. Dkt. 125.

## II. FACTUAL BACKGROUND

Unless stated otherwise, the facts herein are undisputed. This matter arises out of a dispute regarding Plaintiff's purchase of Defendant's company, International Electronics, Inc. ("IEI"). Dkt. 9 ("Amended Complaint") ¶ 2. Plaintiff The Chamberlain Group, Inc. ("Chamberlain") acquired IEI on or about July 27, 2007. *Id*. At the time, Defendant Shary Nassimi ("Nassimi") was the sole owner of IEI. *See* Dkt. 55.

Chamberlain is a large manufacturer of radio-controlled products, including garage-door openers, gate openers, and other access control devices. *Id.* ¶ 1. Nassimi was the sole owner of IEI, a company that was in the business of manufacturing and selling radio-controlled products, including access control devices. *Id*. ¶ 3.

Radio devices such as those manufactured by Nassimi and Chamberlain are subject to a series of FCC regulations, commonly referred to as "Part 15." 47 C.F.R. Part 15. To obtain certification for such devices, a company must submit a representative sample device to an independent testing facility that determines, among other things, whether the power output levels for the devices comply with FCC Part 15 regulations. Compliance will generally result in FCC certification of the product. Deposition of Michael Schafer (Schafer Dep.), Dkt. 83, Ex. 1 at 17:5-13; 24:4-25; 25:22 (explaining the general process by which a company like IEI would obtain device certification from the FCC). The FCC relies on these independent testing facilities and rarely engages in its own testing before granting certification. *Id.* at 24:4-25:22.

On July 27, 2007, Chamberlain and Nassimi entered into an agreement whereby Chamberlain would acquire the shares and intellectual property of IEI and Nassimi (the "Agreement"). Dkt. 83, Ex. 4 (copy of the Agreement). Chamberlain acquired these assets from IEI and Nassimi for $14 million. *Id*. at § 2.2 (purchase price). Chamberlain made such payment. Dkt. 78 (Amended Counterclaim ¶ 19.). The Agreement contained other

terms regarding payment that are not relevant to the instant motion. When Chamberlain

acquired IEI, one of Nassimi's employees, Jim Crider ("Crider"), became an employee of

Chamberlain. *See* Declaration of Thomas A. Brookbank ¶¶ 2, 3.

Nassimi made certain express warranties within the Agreement that were made

both personally and on behalf of IEI. Agreement at 12 (Article III). The warranties at

issue provided as follows:

> The Company is, and at all times since December 31, 2002 has been,
> in material compliance with each Law that is or was applicable to it or the
> conduct of its business or the ownership or use of any of its assets. To
> Seller's *Knowledge*, no event has occurred or circumstance exists that (with
> or without notice or lapse of time) may cause the Company to violate any
> *Law* or may give rise to any obligation on the part of the Company to
> undertake, or to bear all or any portion of the cost of, any remedial action of
> any nature.

Agreement § 3.22(a) (emphasis added).

"Knowledge" is defined by the Agreement as follows: "with respect to Seller or

the Company, the actual knowledge after reasonable investigation of Seller, Jim Crider,

Ruth Millard and Sonia Lawhead. Agreement § 1.1 (definitions). "Law" is defined by the

Agreement as "any constitution, law, statute, treaty, rule, regulation, ordinance, code,

binding case law, principal of common law or notice of any *Governmental Body*." *Id.*

(emphasis added). "Governmental Body" is defined by the Agreement as any federal or

state governmental agency, like the FCC. *See id*.

In his deposition, Nassimi confirmed that § 3.22(a) constituted a warranty that

IEI's products complied with the relevant FCC regulations and that to his and Crider's

"Knowledge," there were no circumstances that would cause IEI's products to be in

violation of the applicable "Laws." Deposition of Shari Nassimi (Nassimi Dep.), Dkt. 83,

Ex. 5 at 246:20-22; 239:18-22 (discussing the meaning of the warranties set out in §

3.22(a)).

In March of 2008, Chamberlain discovered that certain of the IEI legacy[1] products did not comply with the FCC regulations. Deposition of Robert Roy Keller, Jr. (Keller Dep.), Dkt. 83, Ex. 8 at 49:15-22; 51:4-20; 54:2-6; *see also* Ex. 165 to Keller Dep. (describing Keller's learning from Crider that certain of the IEI devices were not FCC compliant). Specifically, Keller discussed that, while still working at IEI, Crider, post FCC certification, added an amplifier to increase the power level of the 300MHz "PIR," an IEI device. Deposition of James David Crider (Crider Dep.), Dkt. 83, Ex. 11 at 39:5-16; 41:6-21 (discussing Crider's knowledge that the PIR was modified after FCC compliance). Crider acknowledged in his deposition that while working for IEI he understood that modifying a device after certification and failing to re-certify the device with the FCC is a violation of FCC regulations. *Id.* at 117:15-21. Crider also acknowledged that he was aware that the PIR was not operating within the acceptable power output limits set out by the FCC. *Id.* at 48:18-20. Chamberlain learned of Crider's knowledge regarding the uncertified changes to the PIR and other devices in March of 2008, when Crider (then a Chamberlain employee) informed Chamberlain of the matter. *Id.* at 158:22-160:6. Based on Crider's disclosure, Chamberlain turned itself in to the FCC. Dkt. 83, Ex. 22 (letter regarding Chamberlain's noncompliant IEI legacy products).

In June 2009, Chamberlain learned of another set of IEI's products that was also noncompliant with FCC regulations. These products included the 900Mhz products. Crider informed Chamberlain that, while he was at IEI, he "powered down [the devices] so that they did not broadcast at the same power level as the actual manufactured devices" because this would gain FCC compliance. Crider Dep. 83:12-22. The actual devices sold operated on a higher, noncompliant power output level. *Id.*

---

[1]The term "legacy," as used herein, refers to products originally developed and sold by IEI prior to the Agreement with Chamberlain.

Subsequent to learning of the power alterations in the IEI legacy products, Chamberlain submitted samples of IEI manufactured products to LSR Research ("LSR") for independent testing to determine whether the products complied with the FCC regulations. Dkt. 83, Ex. 2 (report of Ken Boston). They did not comply. Of the devices tested, all but one of the IEI legacy products "were found to exceed the FCC limits by a substantial amount and therefore [could not] be sold legally in the USA." *Id*. at 16. Additionally, Nassimi's FCC testing expert agreed that the power outputs found in LSR's examination of the tested devices were in excess of that for which the FCC would grant certification. Deposition of Randall Clark (Clark Dep.), Dkt. 83, Ex. 25 at 77:16-22; 78:21-79:4 (not finding reason to challenge LSR's report). Within his deposition, Clark did present a basis on which to dispute the LSR findings.

### III. DISCUSSION

The instant partial summary judgment motion pertains only to Nassimi's liability for Chamberlain's breach of contract claim. Dkt. 82. Although damages are pleaded by Chamberlain, it concedes the amount is a question of fact. Dkt. 82 at 14.

**A.    Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson,* 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.      Chamberlain's Partial Summary Judgment Motion**

      **1.      Breach of Contract in Washington**

In Washington, a contract breach is actionable when the contract (1) imposes a duty, (2) the duty is breached, and (3) the breach proximately caused damage to the one to whom the duty is owed. *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712 (1995). The breach need not be material. *TMT Bear Creek Shopping Ctr., Inc. v. Petco Animal Supplies, Inc.*, 140 Wn. App. 191, 210 (2007). Thus, it is not enough for a plaintiff to show that a breach occurred. *See Commercial Inv. Co. v. Nat'l Bank of*

1  *Commerce*, 36 Wash. 287, 293 (1904). A plaintiff must also establish the damages

2  resulting from the breach with a reasonable degree of certainty. *Larsen v. Walton*

3  *Plywood Co.*, 65 Wn.2d 1, 15 (1964). Damages need not be proven with mathematical

4  certainty, but must be supported by evidence that provides a reasonable basis for

5  estimating the loss, not merely speculation or conjecture. *Shinn v. Thrust IV, Inc.*, 56 Wn.

6  App. 827, 840 (1990). Additionally, costs the plaintiff would have incurred had there

7  been no breach must be considered in determining the plaintiff's lost profits. See *Platts v.*

8  *Arney*, 50 Wn.2d 42, 46 (1957). A claim for lost profits is properly denied if the alleged

9  loss cannot be adequately proved and remains speculative. *See Golf Landscaping, Inc. v.*

10  *Century Constr. Co.*, 39 Wn. App. 895, 903 (1984).

11         **2.      Nassimi's Duty**

12         Chamberlain argues that Nassimi's warranties regarding knowledge and

13  compliance with respect to the applicable laws, as defined by the Agreement, imposed a

14  duty upon Nassimi to deliver "a company (a) that complied with the law, including, as

15  Nassimi admits, FCC regulations and (b) that IEI faced no circumstances that 'may cause

16  the company to violate any Law or may give rise to any obligation on the part of the

17  Company to undertake, or to bear all or any portion of the cost of, any remedial action of

18  any nature.'" Dkt. 82 at 10 (quoting the Agreement § 3.22(a)). Nassimi does not contend

19  he lacked the duty to deliver IEI consistent with that which he warranted. *See* Dkt. 107

20  (response in opposition to the instant motion). The express language of § 3.22(a) makes it

21  difficult, if not impossible, for Nassimi to argue otherwise:

22

23         The Company is, and at all times since December 31, 2002 has been,
       in material compliance with each Law that is or was applicable to it or the
24     conduct of its business or the ownership or use of any of its assets. To
       Seller's *Knowledge*, no event has occurred or circumstance exists that (with
25     or without notice or lapse of time) may cause the Company to violate any
       Law or may give rise to any obligation on the part of the Company to
26     undertake, or to bear all or any portion of the cost of, any remedial action of
       any nature.
27

28

Agreement § 3.22(a) (emphasis added).

Based on the foregoing, the Court concludes that Nassimi owed such a duty consistent with his warranty, § 3.22(a); therefore, the duty element is satisfied.

### 3.     Nassimi's Breach

Chamberlain argues that Nassimi breached the Agreement under both the knowledge warranty and the compliance warranty. *See* Dkt. 125 at 5-7. In opposition, Nassimi argues that any breach was immaterial and, therefore, not actionable. However, such argument is belied both by logic and the relevant case law.

To begin with, Nassimi argues that the "applicable contract term requires that the breach, if any, must be material. Dkt. 107 at 18. Specifically, Nassimi quotes the Agreement wherein it provides "[t]he Company is, and at all times since December 31, 2002 has been, in *material compliance* with each law that is or was applicable to it or to the conduct of its business or the ownership or use of any of its assets." Dkt. 107 at 18 (quoting the Agreement § 3.22(a)) (emphasis added). However, it does not follow from even the most liberal reading of this clause that, to be actionable, the breach of contract must be material. Rather, "material" modifies the term "compliance" and does so in the context of "material compliance" with the laws applicable to FCC compliance for the IEI legacy products, which Chamberlain acquired under the Agreement. To suggest otherwise disregards the context of the Agreement. *See* Agreement § 3.22(a) (Warranties).

More importantly, materiality in the context of a breach of contract claim is an element to be proven only when the relief sought is rescission or to discontinue further performance under the contract. *Park Ave. Condo. v. Buchan Devs.*, 117 Wn. App. 369, 383, 71 P.3d 692 (2003) (discussing rescission); *see also Rosen v. Ascentry Technologies, Inc.*, 143 Wn. App. 364, 369 (2008) (a material breach "gives the non breaching party the right to withhold further performance"). Indeed, "materiality is a term of art in contract

analysis, and identifies a breach so significant it excuses the other party's performance

and justifies rescission of the contract." *Park Ave. Condo*, 117 Wn. App. at 383.

Although Nassimi cites several cases discussing the means by which one proves a

material breach, he cites no authority for the proposition that a breach of contract claim

can only be maintained if the breach can be considered material. For example, one of the

cases Nassimi cites relates to proving materiality where a party seeks to rescind the

contract. *See* Dkt. 107 at 18 (citing *Mitchell v. Straith*, 40 Wn. App. 405, 410 (1985)

(where rescission is sought under a breach of contract theory, the breach must be

material)).

Because Chamberlain is not moving for summary judgment on the issue of

rescission or ongoing performance, whether the breach was "material" is not at issue for

purposes of resolving the instant motion. The question is whether the contract was

breached, even if only a technical breach.[2]

The Court now turns to the two warranties on which Chamberlain predicates its

breach of contract theory.

### a.    Nassimi's Warranty Regarding Knowledge

To establish this breach of the warranty regarding knowledge, Chamberlain relies

on the knowledge of Crider with respect to the alteration of devices following their

approval by the FCC. *Id*. Specifically, Chamberlain argues that (1) Crider knew of the

violations at the time of Chamberlain's acquisition of IEI; (2) Crider understood the

applicable FCC rules and regulations, specifically as it related to power levels; (3) Crider

---

[2]In the alternative, Chamberlain argues that the breach was material if the Court accepts Nassimi's "gloss" over the "material compliance" term in § 3.22(a). The Court does not apply this gloss. However, if the Court were to apply this gloss, it remains a question of material fact as to whether the breach was, indeed, material. Therefore, the Court declines to consider Chamberlain's alternative argument.

modified the devices following FCC certification to levels that exceed the power limits imposed by the FCC, even if re-certification was sought; (4) Crider discussed with Nassimi that the products exceeded the FCC limits as to at least some of the IEI devices at issue; and (5) Nassimi admitted that Crider's knowledge binds Nassimi under the terms of the Agreement. *Id*. (citing Nassimi Dep. 239:18-22 (knowledge of Crider attributed to Nassimi); Crider Dep. 31:13-22 (Crider's familiarity with FCC regulations and that IEI was not in compliance with each of its devices at the time of acquisition); Crider Dep. 29:20-30:8 (admitting to having discussions with Nassimi about the FCC noncompliance issues)).

Nassimi does not dispute that Crider was aware of the noncompliant products. This failure of Nassimi to dispute Crider's pre-sale knowledge regarding noncompliance with the relevant FCC regulations is fatal to defeating Chamberlain's claim of breach of contract. The express warranty made by Nassimi provided that "[to Nassimi's] Knowledge, no event has occurred or circumstance exists that (with or without notice or lapse of time) may cause the Company to violate any Law . . . ." Agreement § 3.22(a). It is undisputed in this case that for purposes of interpreting the Agreement, the term "Law" includes the FCC regulations under Part 15 and that "Knowledge" includes that which Nassimi or Crider knew as it pertained to the legality of the IEI product line.

Because it is undisputed that Crider knew of the noncompliance of certain IEI products and because such noncompliance violated the applicable FCC regulations, Nassimi breached the contract's warranty provision, which he expressly provided for in the Agreement. *See id*. These facts alone constitute a breach of the duty owed by Nassimi to Chamberlain. Therefore, no material question of fact remains as to this issue.

1

### b.     Compliance Warranty

2

Nassimi concedes he made a compliance warranty, which provided as follows:

3

"The Company is, and at all times since December 31, 2002 has been, in *material*

4

compliance with each Law that is or was applicable to it or the conduct of its business or

5

the ownership or use of any of its assets." Dkt. 107 at 6 (citing Agreement §3.22(a)

6

(emphasis added)).

7

Nassimi's response in opposition to the instant motion is curious regarding the

8

compliance warranty. Instead of arguing that the products were in compliance, he argues

9

that the noncompliant products could have easily been brought into compliance by

10

altering their operation. *See, e.g.,* Dkt. 107 at 11-12 ("If the circuit added to the Reporter

11

increased the Reporter power emission near or above the FCC limit, that issue could

12

easily have been addressed by decreasing the power emission.") However, as discussed

13

above, alteration to a device following FCC certification cannot be legally sold in the

14

United States until it has been re-certified by an authorized testing facility.

15

16

The express compliance warranty made by Nassimi was qualified. It warranted

17

that IEI products were in "material compliance" with the applicable laws.  Agreement §

18

3.22(a). It is undisputed that Chamberlain sent certain of IEI legacy products for testing

19

and determined that they were not legal to sell in the United States due to noncompliance.

20

It cannot be questioned, and Nassimi does not attempt to argue, how an illegal product

21

could be considered to be in "material compliance" with the relevant FCC regulations.

22

Such a position would be untenable. Whether or not the noncompliant products could be

23

remedied is irrelevant to the question of whether Nassimi delivered a company whose

24

products were, in fact and as warranted, in material compliance with the applicable

25

"Law."

26

27

28

ORDER - 11

Therefore, this is another basis on which Chamberlain has established that no material question of fact exists as to wheather Nassimi breached his duty owed pursuant to the Warranties section of the Agreement.

### c.    Conclusion

Based on the foregoing, Chamberlain has established a breach of contract on the basis that Nassimi breached the duties owed as they pertain to his express warranties in § 3.22(a) of the Agreement, i.e. knowledge and compliance.

### 4.    Damages

Chamberlain does not seek to prove the amount of damages at this time. Rather, Chamberlain merely seeks to establish that it has been damaged and that liability for such damage rests with Nassimi. Dkt. 82 at 13-14. Chamberlain argues that damages can be accounted for based on losses sustained as a result of halting production of the offending legacy products, removing the products from the market, and incurring costs in assessing the situation. Dkt. 82 at 14.

Because the Court finds that Nassimi owed a duty and breached that duty, the only remaining question for liability is whether the damage element can be established. *See Nw. Indep. Forest Mfrs.*, 78 Wn. App. at 712 (elements of a breach of contract claim). Chamberlain's expert, Neil J. Beaton, believes that Chamberlain's damages rest somewhere between $12 million and $16 million. Dkt. 83, Ex. 27 (Amended Beaton Report ¶ 6, expert damage report).

In opposition, Nassimi argues that Beaton's report must be disregarded because his assumptions are flawed. *See* Dkt. 107 at 20. Nassimi has filed a separate *Daubert* motion with respect to this argument in an effort to exclude Beaton's damages analysis. *Id.* However, the Court need not resolve that motion to determine whether Chamberlain has established damages sufficient to sustain the instant motion.

Nassimi's own expert, Robert A. Wagner ("Wagner"), initially filed a report that concluded that the damages in this case may rise to (but not exceed) $3.05 million, with an additional adjustment for $285,000 due to 2008 product issues. Dkt. 83, Ex. 28 at 12 (MRW Advisory Report, dated July 1, 2010). Wagner has since recanted his position as outlined in the report. *See* Declaration of Adam Wiers (Wiers Decl.), Dkt. 127, Ex. C (Robert A. Wagner Deposition (Wagner Dep.)). In his August 17, 2010, deposition Wagner now claims to have "no opinion as to what the damages might be." *Id*. at 61:12-17.

It is curious to the Court that Wagner's assessment on damages initially put a cap at around $3.2 million in July and then in August claimed to have no opinion on the matter. *See* Wagner Dep. at 61:12-17. Nonetheless, Wagner's deposition still supports a conclusion that the breach by Nassimi caused Chamberlain some level of damages. Wagner testified in his deposition that the "problems with the 300-megahertz products in 2008 . . . required some redesign . . . in the neighborhood of $100,000, $150,000 . . . . And then in 2009 the . . . 900 [megahertz] products" required some "reengineering . . . in the neighborhood of $600,000." *Id*. at 90:9-20. While Wagner claimed that this amount of expense incurred rising upwards of $750,000 may overvalue the true loss incurred, he never suggested that the loss incurred as a result of the breach equaled zero.

The exact amount of damages need not be quantified at this stage of litigation. With respect to the instant motion, Chamberlain has presented sufficient evidence to support some level of damages caused by Nassimi's breach, and Nassimi has presented no evidence to create a question of fact as to whether the damages incurred as a result of the breach are equal to zero.

Therefore, the damages element has been satisfied for purposes of establishing liability; the amount of damages remains a question for the jury.

1

**IV. ORDER**

2        Therefore, it is hereby **ORDERED** that Chamberlain's motion for partial summary

3 judgment on the issue of liability for its breach of contract claim against Nassimi (Dkt.

4 82) is **GRANTED** as discussed herein.

5        DATED this 25th day of October, 2010.

6

7        _____

8        BENJAMIN H. SETTLE
         United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28